UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

ANTONIO GUASTELLA,

        Petitioner,

  - against -

UNITED STATES OF AMERICA

        Respondent.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/8/09

**OPINION AND ORDER**

06 Civ. 2924 (SAS)

98 CR 1325-01 (SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

      Petitioner Antonio Guastella, proceeding pro se, filed a motion

pursuant to section 2255 of Title 28 of the United States Code ("section 2255") to

correct, vacate or set aside a judgment of conviction entered by this Court on

February 11, 2002.[1]  Read liberally, Guastella's Motion raises the following

---

[1]    *See* Memorandum of Law in Support of Petitioner's 28 U.S.C. 2255
[Motion], dated February 25, 2008 (hereinafter referred to as the "Motion").
Guastella's Motion is divided into the following ten sections: three "Ineffective
Assistance of Counsel" sections; three "Prosecutorial Misconduct" sections; two
"Denial of Due Process" sections; a section entitled "Discharge from Restitution;"
and a section entitled "Correction of Sentencing."  The arguments in the
"Discharge from Restitution" section are more fully advanced in Guastella's
"Motion for Modification of Imposed Restitution," which is addressed in a
separate Opinion and Order.

claims: (1) insufficiency of evidence;[2] (2) ineffective assistance of counsel; (3) prosecutorial misconduct; (4) lack of jurisdiction over the prosecution; (5) failure to allege a nexus between the criminal conduct in issue and interstate commerce; (6) violation of petitioner's Sixth Amendment Confrontation Clause rights through the introduction of co-defendants' plea allocutions;[3] and (7) unwarranted sentencing disparity.[4] Guastella also filed a "Motion for Inspection and

_____

[2]    Guastella does not include a specific section addressing insufficiency of the evidence. Instead, his insufficiency arguments are scattered throughout several "Ineffective Assistance of Counsel," "Prosecutorial Misconduct," and "Denial of Due Process" sections.

[3]    Citing *Crawford v. Washington*, 541 U.S. 36 (2004).

[4]    Guastella makes passing reference to a Double Jeopardy violation, *see* Motion at 2, but this claim can be summarily dismissed for two reasons. *First*, Guastella does not suggest a possible basis for finding a Double Jeopardy violation here. *See* Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings for the United States District Courts (petitioner must set forth "the facts supporting each ground" for relief); *Grant v. Connell*, No. 06 Civ. 4364, 2008 WL 834184, at *4 (S.D.N.Y. Mar. 27, 2008) ("A federal habeas petition 'may be dismissed if it contains only vague or conclusory allegations.'") (quoting *Banks v. New York State Dep't of Corr. Servs.*, No. 01 Civ. 3985, 2001 WL 1448612, at *2 (S.D.N.Y. Nov. 15, 2001) (citing *Blackledge v. Allison*, 431 U.S. 63, 75 (1977)). *Second*, Guastella failed to raise a Double Jeopardy claim on direct appeal and makes no attempt to show cause for that failure. Accordingly, any Double Jeopardy claim has been procedurally defaulted. *See Sapia v. United States*, 433 F.3d 212, 217 (2d Cir. 2005); *United States v. Canady*, 126 F.3d 352, 359 (2d Cir. 1997) ("Ordinarily, the failure of a federal defendant to raise an issue on direct appeal will bar the defendant from raising the issue for the first time in a habeas petition unless the defendant can show 'cause and actual prejudice.'") (quoting *Reed v. Farley*, 512 U.S. 339, 355 (1994)).

Discovery" (the "Discovery Motion"). For the following reasons, both motions are denied.

## I.  BACKGROUND[5]

### A.  Introduction

Superseding Indictment S1 98 CR 1325 (SAS) (the "Indictment"), filed on September 21, 1999, charged multiple counts of fraud and other monetary crimes against Guastella. Count One charged Guastella, Robert Martins, Michael McClain, Marianne Curtis, Louis Frechette, and Roy Thornton with conspiracy to commit wire fraud, in violation of Title 18, United States Code, section 371. Counts Two through Eleven each charged Guastella and Martins with committing wire fraud in violation of Title 18, United States Code, section 1343. Count Twelve charged Guastella and Martins with conspiracy to commit money laundering in violation of Title 18, United States Code, section 1956(h). Count Fourteen charged Guastella with engaging in monetary transactions with criminally derived property in violation of Title 18, United States Code, section 1957. Count Seventeen charged Guastella with interstate transportation of stolen property in violation of Title 18, United States Code, section 2314. The

---

[5]     This section is taken from the transcript of the trial, which commenced May 16, 2001, and ended June 13, 2001, and various Exhibits introduced by the Government at that trial.

3

Indictment also contained a forfeiture allegation seeking forfeiture of certain assets involved in  Guastella's money laundering offenses.

The proof at trial overwhelmingly established that Guastella and Martins orchestrated an elaborate and brazen investment fraud scheme, marketed over the Internet from the Fall of 1997 to the Summer of 1998.  In this scheme, Guastella and Martins promised investors the opportunity to "lease" one million dollars or more from top ranked European banks – principally "First Mutual Sparkassa" of Stockholm, Sweden – in exchange for a fee of $35,000 per each million dollars of "leased" funds.  Investors were told that each one million dollars of "leased" funds would be placed in a "high-yield investment program" which would generate returns of five million dollars or more within a ten-month period. Upon payment of their fees, investors were sent "proof of funds" letters on what appeared to be official bank stationery representing that the bank was holding their leased funds in "custodial trust accounts" in the investors' names.

In fact, the investment program was entirely fictitious.  The European banks did not exist, there were no custodial trust accounts, and no one was holding millions of dollars on behalf of the investors.  The "proof of funds" letters were generated on Guastella's home computer and signed by him in the names of fictitious bank officers.  Nor were there any "high-yield investment programs" as

4

promoted by the scheme.

Before Guastella and his co-conspirators were arrested in September

1998, he and Martins defrauded approximately 172 victims out of more than $16.7

million. Guastella and Martins divided the proceeds, which were spent lavishly on

new homes and luxury cars, withdrawing hundreds of thousands of dollars in cash

from ATM machines, and laundering millions of dollars through offshore bank

accounts located in the Bahamas and Luxembourg.

At the end of a five-week trial, the jury found Guastella guilty on

Counts One through Seven, Nine, Twelve, Fourteen, and Seventeen. On January

29, 2002, this Court sentenced Guastella to 200 months in custody, to be followed

by a five-year term of supervised release. Guastella was also ordered to: pay

restitution in the amount of $16,762,000; forfeit the sum of five million dollars

and various specific assets; and pay a special assessment totaling $1,100. In

affirming his conviction, the Second Circuit addressed Guastella's numerous

appellate arguments, with the exception of his ineffective assistance claim, in two

separate opinions.[6]

---

[6]     *See United States v. McClain*, 377 F.3d 219 (2d Cir. 2004); *United States v. McClain*, 108 Fed. App'x 670 (2d Cir. 2004). The Second Circuit did not address Guastella's ineffective assistance of counsel claim. *See McClain*, 108 Fed. App'x at 676 ("Guastella's challenge to his conviction based on ineffective assistance of counsel is DISMISSED without prejudice to his asserting it in a

**B.    The Government's Case**

In establishing Guastella's guilt, the Government called over twenty

witnesses at trial, including eleven victims of the scheme, who collectively lost

over a million dollars. These witnesses testified to the numerous

misrepresentations made to them, both orally and in writing, by Guastella,

Martins, and their co-conspirators. The Government also called Carl Grahn, an

official of the Swedish banking regulatory authority; Curt Lundstrom, a Swedish

businessman who set up mail and telephone answering services for First Mutual

Sparkassa in Sweden; Herbert Biern, a representative of the Federal Reserve

Board who testified as an expert witness to the fictitious nature of "Prime Bank"

and "high-yield investment" programs; Leslie Klein and Franklyn Clarke,

representatives of two domestic brokerage firms where Guastella and Martins

maintained brokerage accounts in connection with the scheme; and Deborah

Morrisey, a Special Agent of the United States Customs Service ("Customs"), who

traced Guastella's spending of victims' money.

The Government introduced several hundred exhibits at trial,

including dozens of documents seized pursuant to search warrants at Guastella's

Las Vegas residence, which provided virtually irrefutable evidence of his

_____

motion pursuant to 28 U.S.C. § 2255.").

participation in the scheme to defraud and his fraudulent intent. The Government

also introduced fraudulent documents received by victims; bank and brokerage

account records establishing Guastella's receipt and laundering of the proceeds of

the fraudulent scheme; and records relating to numerous maildrop addresses and

telephone numbers used by Guastella in connection with the scheme.

## C.    The Fraudulent Scheme

### 1.    The Fraudulent "Euro Banque" Transactions

In the late Summer of 1997, Martins joined forces with Guastella,

who provided a fictitious European bank that would pretend to supply "leased"

funds to investors. In mid-September 1997, Guastella faxed Martins a list of

corporate names he had "legally available" for use, many of which traded off the

names of well-known financial institutions, such as "Citicorp Pos Services, Inc.,"

"Paine Webber Capital Corp.," and "Smith Barney Funding LP." Guastella and

Martins ultimately selected "Euro Banque," which was a variation of one of

Guastella's listed suggestions, "Eurowest Banque, Corp." Guastella obtained

blank letterhead for Euro Banque (found in his Las Vegas residence after his

arrest), which proclaimed that Euro Banque had been "serving the financial

community since 1973." The letterhead listed an address for Euro Banque in

London, England but that address was simply a maildrop.

In the Fall of 1997, Guastella and Martins proceeded to defraud several investors into believing that Euro Banque was a genuine European bank that could "lease" them funds. In exchange for paying their "lease" fees, investors received an official-looking "proof of funds" letter from Euro Banque, which purported to confirm that Euro Banque was holding their leased funds in an account in their name. The letters were signed by "Phillip Curran" and "William O'Donoghue," the Vice President of Operations and Chief Operating Officer, respectively. In reality, these proof of funds letters were generated and signed by Guastella at his home in Las Vegas.

### 2.   The "First Mutual Sparkassa" Fraud

In late 1997, Guastella and Martins replaced Euro Banque with another fictitious European bank, "First Mutual Sparkassa," purportedly located in Stockholm, Sweden. Over the next several months, Guastella and Martins defrauded scores of investors of approximately sixteen million dollars by pretending to "lease" them funds from First Mutual Sparkassa for use in a high-yield investment program. The scheme ensnared investors located across the United States, as well as in Canada, Mexico, Europe, and the Far East. At its peak, the scheme attracted several new investors each day.

8

Guastella hired a Swedish firm, "Business Supplies," to provide him with a mail forwarding service for First Mutual Sparkassa in Sweden. The address listed for First Mutual Sparkassa on its letterhead – Odengatan 38, Stockholm, Sweden – was in fact the Stockholm address of Business Supplies. The postal address listed for First Mutual Sparkassa on the letterhead likewise was a post office box maintained by Business Supplies. When mail for First Mutual Sparkassa was sent to Sweden, Business Supplies would collect it and forward it to Guastella in Las Vegas. Investors were thereby deceived into believing that they were corresponding with a real Swedish bank, when in fact all communications were simply re-routed to Guastella in Las Vegas.

To further create the illusion that First Mutual Sparkassa was a real Swedish bank, Guastella set up a telephone answering service to handle calls from people who called the telephone number listed on the First Mutual Sparkassa letterhead. Initially, callers were directed to a telephone answering machine whereby they heard a message stating that they had reached the offices of First Mutual Sparkassa and should leave a message. These messages were then transmitted by Business Supplies via e-mail to Guastella. In early 1998, Guastella requested a more sophisticated service, in which callers would reach a live operator on the other end. When the caller asked to speak to someone, the

9

operator was instructed to advise the caller that "everyone is busy" and take a message.  The operator was then instructed to relay the message as soon as possible, via fax or e-mail, to Guastella in Las Vegas.

In addition to creating a fictional physical presence for First Mutual Sparkassa in Sweden, Guastella invented the names of fictional bank officers, as he had done with Euro Banque.  These included "Verlag Tegtmaier Nachft," the Vice President of Operations; "Geoffrey M. Jones," the Operations Supervisor; and "Michael MacClane," the Director-Operations (sometimes described as the Vice President of Operations).  The names of these non-existent bank officers appeared on proof of funds letters and other correspondence sent to investors, all of which were generated on Guastella's home computer in Las Vegas.

### 3.    The Assets International Rental Agreement

Once First Mutual Sparkassa had been established, Martins entered into written contracts with investors through his company "Assets International," in  which he agreed to lease them one million dollars from First Mutual Sparkassa for each $35,000 commitment fee paid.  These contracts, denominated as "Confirmation of Funds/Callable Rental Agreement," falsely represented that Global Credit & Trust and the "Contracted Financial Institution" would "make the funds available" to the investor for use in a high-yield investment program.

The Assets International rental agreement also contained a set of "Escrow Instructions/Procedures" regarding the payment of the investor's rental fee. Those instructions typically instructed the investor to send his or her money to Guastella's personal account, the Global Credit account, at Smith Barney. The rental agreement falsely represented that the money would be credited to an "escrow" account in the investor's name, thus deceiving investors into believing that their money would be secure until the "trading" program commenced. In fact, the Global Credit account was a retail brokerage account, not an escrow account, and Smith Barney never held any of the funds sent to that account in escrow. Instead, Guastella and Martins would simply split the funds sent by investors to the Global Credit account upon receipt.

Another key aspect of the fraud was a confidentiality provision, which Martins inserted into the Assets International rental agreement at Guastella's suggestion. This provision prohibited investors from communicating with First Mutual Sparkassa, and stated that a breach of this condition would result in termination of the contract and "forfeiture of any fees paid." This provision had its intended effect. Fearful that they would be deemed in breach and removed from the investment program, many investors did not even attempt to contact First Mutual Sparkassa. Others who did so were sternly reminded by Martins of their

11

confidentiality obligations.

### 4.    The Phony Proof Of Funds Letters

After entering into "rental agreements" with Assets International,

investors received "proof of funds" letters on First Mutual Sparkassa letterhead.

These phony letters misrepresented First Mutual Sparkassa as "First Mutual

Savings Bank," contained the maildrop address Guastella had established in

Stockholm, and were signed by fictitious bank officers including "Geoffrey

Jones," "Verlag Tegtmaier Nachft," and "Michael MacClane." Guastella also

procured a corporate seal for First Mutual Sparkassa (found in his residence after

his arrest) and affixed the seal to the proof of funds letters to lend them a greater

aura of authenticity.

The proof of funds letters falsely claimed that First Mutual Sparkassa

was holding one million dollars or more – whatever amount the investor's

believed he or she had "leased" – in cash in a "custodial trust account" in the

investor's name. The letter further purported to confirm that "[t]hese funds are

available as of today's date" and "may be drawn upon delivery of an acceptable

Bank Guarantee, collateral, principal and interest." Guastella generated dozens of

these letters. First Mutual Sparkassa, however, had no identifiable assets at all.

12

### 5.    The Fictitious Trading Program

In early 1998, Guastella and Martins added another important new dimension to their fraudulent scheme.  They began referring investors to Louis Frechette and Marianne Curtis who, they claimed, were experienced and successful traders who could place the investors' "leased" funds into a high-yield investment program.  Eventually, the investment was marketed as a single package, with Assets International and First Mutual Sparkassa purportedly providing the leased funds, and Curtis' company, TMZ Trading, Inc. ("TMZ"), providing the trading program.  As a result, investors would enter into two written agreements in connection with their investments:  first, a "rental agreement" with Assets International for the lease of funds from First Mutual Sparkassa; and, second, a "private placement agreement" with TMZ Trading in which TMZ promised to place the investors' "leased" funds into a highly lucrative trading program.

Curtis and Frechette performed another valuable service for the scheme.  When the profits expected by investors did not materialize, they fended off investors' complaints by fabricating various reasons for the delay.  Frechette had dozens of conversations with investors, assuring them that success was imminent.  Curtis prepared written "investor updates" which were circulated to

investors in May and June 1998 that blamed the delays on "more stringent banking regulations," "banking problems, compliance problems and procedures that were not acceptable," and even the investors themselves. At the same time, Curtis misled investors by continually holding out the prospect that she was on the verge of completing a transaction that would yield the fantastic profits promised. In exchange for their participation in the fraudulent scheme, Curtis and Frechette each received substantial payments from Guastella. Curtis received $15,000 and a new computer; Frechette received more than $50,000.

### 6. The Use of Brokers to Recruit Victims

At the inception of the scheme, Martins dealt directly with investors, often using high-pressure sales tactics. As the scheme expanded, Guastella and Martins utilized a network of brokers – including Roy Thornton, Elizabeth Russell, Pat Gambuti, James Kirk and Peggy Anderson – to recruit additional victims. These brokers lured investors into the scheme by repeating the same misrepresentations used by Guastella and Martins, *i.e.*, that First Mutual Sparkassa was a "very solid bank," "a reputable bank in Stockholm, Sweden;" that Assets International had been "doing this a long time" and had an "unblemished" track record; that Curtis was an "accomplished trader" who had been "very successful;" and that the investors' funds would be sent to and secured in an "escrow account."

14

Guastella and Martins paid the brokers approximately $5,000 for each $35,000 in rental fees collected. Thornton received more that $35,000; Russell and Gambuti together received nearly $50,000; Anderson received $35,000; and Kirk received $130,000. These payments were not disclosed to investors, who had been told that the brokers stood to gain nothing unless the investors received profits.

### D.   Money Laundering

After investors wired their funds to the Global Credit account at Smith Barney – notwithstanding the representations made to investors that their funds would be held in "escrow" – Guastella typically transferred, almost immediately, half of the proceeds to an account that Martins had opened at Smith Barney in the name of "Alpine Limited" ("Alpine"). Before they were arrested, Guastella and Martins spent and laundered millions of dollars of these funds, using an array of shell companies and nominee bank accounts to conceal their ownership interests in the assets.

In November 1997, Guastella purchased a $575,000 home in Las Vegas, in the name of Seiko America Corporation, using investor funds for the down payment. Thereafter, Guastella used investor funds to make nearly $200,000 in mortgage payments on the property. These payments were mainly

funneled through accounts maintained by Guastella's brother and sister-in-law.

Guastella also spent more that $100,000 of fraud proceeds to purchase two luxury

vehicles: a 1988 Bentley and a 1989 Rolls Royce, which he registered in the name

of Global Credit & Trust and his sister-in-law, respectively.  In addition, Guastella

and Martins transferred millions of dollars of investors' funds to offshore money

laundering havens.  Specifically, on May 20, 1998, Guastella wrote a check for

$500,000 on the Global Credit account, which was deposited at a bank in

Luxembourg and credited to an account Martins maintained in the name of "NB

Investments" with a Luxembourg asset management firm.  Finally, Guastella and

Martins simply dissipated large chunks of investor funds by withdrawing cash

from ATM machines.  More than $200,000 of investor funds were withdrawn in

cash from Guastella's accounts at Smith Barney over a six-month period.

## E.     The Collapse of the Scheme

For nearly eight months, Guastella and Martins managed to avoid

detection by law enforcement, even though scores of victims had sent them over

sixteen million dollars without receiving any return on their investment.  From

time to time, certain investors questioned whether First Mutual Sparkassa was a

bona fide bank, but Guastella and Martins persuaded them to continue with their

investments by giving them false assurances and promises.

In late June 1998, Leslie Klein, a Smith Barney in-house attorney in New York, began scrutinizing the Global Credit account and the related accounts held by Guastella and Martins at Smith Barney. Suspicious that there were large money movements in and out of the accounts with little or no investment activity, Klein called "Michael McClain" (in actuality, Guastella), whom the Smith Barney broker had identified as the individual who opened the accounts. Klein asked for the source of the money coming into the Global Credit account. Guastella told Klein that Global Credit was in "the real estate business," charged commissions, and had a business relationship with Alpine.

Dissatisfied with this explanation, Klein placed a freeze on the accounts. Over the next two weeks, Klein received and responded to a series of letters from William Reed, who had previously helped Guastella and Martins launder their fraud proceeds. In his letters, which were drafted in part by Guastella and Martins, Reed purported to provide additional information to satisfy Smith Barney's concerns, and threatened legal action if Smith Barney did not lift the freeze. These letters continued to misrepresent the nature of Global Credit's business, claiming that it "consults with other foreign entities to negotiate lease agreements and complete real estate transactions," resulting in "finder's fees, commissions, and a commitment fee." In neither Guastella's initial conversation

17

with Klein, nor in any of the letters sent by Reed, was there any mention of leasing funds, high-yield investment programs, Assets International, or a bank in Sweden.

Even after Smith Barney froze their accounts, Guastella and Martins continued to defraud other investors into leasing funds through Assets International and First Mutual Sparkassa, directing them to send their funds to an account at Norwest Bank, in the name of "American Escrow Services," which was controlled by Reed. Nearly $700,000 in new lease fees were received in the American Escrow Services account in late June and early July 1998. Reed transferred the bulk of these funds at the direction of Guastella and Martins to other accounts at Norwest for which he was the nominal signatory but which were, in fact, operated for the benefit of Guastella and Martins.

On July 9, 1998, the United States Customs Service seized approximately $7.8 million that remained in Guastella's and Martins' Smith Barney accounts, pursuant to a seizure warrant issued in the Southern District of New York. Investors had sent more than thirteen million dollars to the Global Credit account at Smith Barney.

## II.   LEGAL STANDARDS

### A.   Section 2255

Section 2255 allows a convicted person held in federal custody to petition the sentencing court to vacate, set aside or correct a sentence. In particular, "[s]ection 2255 provides that a prisoner sentenced by a federal court may move to have that sentence vacated, set aside or corrected if he or she claims that the court, in sentencing him or her, violated the Constitution or the laws of the United States , improperly exercised jurisdiction, or sentenced him or her beyond the maximum time authorized by law."[7]

A properly filed motion under section 2255 must allege that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack.[8]  Accordingly, collateral relief under section 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental

---

[7]     *Thai v. United States*, 391 F3d 491, 493 (2d Cir. 2005).

[8]     *See* 28 U.S.C. § 2255.

defect which inherently results in a complete miscarriage of justice.'"[9]

## B. Ineffective Assistance of Counsel

A petitioner seeking to attack his sentence based on ineffective assistance of counsel must: (1) show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice," *i.e.*, demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[10] Only if both of these elements are satisfied can a defendant demonstrate that his counsel made errors "so serious" that "counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and that the defendant was, as a result, deprived of a fair

---

[9]     *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). *Accord United States v. DeLuca*, 889 F.2d 503, 506 (3d Cir. 1989) ("Habeas corpus relief is generally available only to protect against a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.").

[10]     *Strickland v. Washington*, 466 U.S. 668, 688, 693-94 (1984). *Accord Hernandez v. United States*, 202 F.3d 486, 488 (2d Cir. 2000) ("Under the *Strickland* standard, a petitioner must establish both (1) that counsel made errors so serious that defendant was deprived of reasonably competent representation and (2) that counsel's deficient performance prejudiced the defense.").

proceeding.[11]

In analyzing a claim that counsel's performance fell short of constitutional standards, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument."[12]  Instead, the court "must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . .'"[13]  As explained by the Supreme Court,

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.[14]

Moreover, "[i]n assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy

---

[11]     *Strickland*, 466 U.S. at 687.

[12]     *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) ("Counsel is not obliged to advance every nonfrivolous argument that could be made.") (citing *Evitts v. Lucey*, 469 U.S. 387, 394 (1985)).

[13]     *Id.* (quoting *Strickland*, 466 U.S. at 689).

[14]     *Strickland*, 466 U.S. at 690-91.

choices."[15]   Thus, a petitioner cannot prevail on a claim of ineffective assistance

merely because he disagrees with his counsel's strategy.[16]

        A habeas petitioner "may establish constitutionally inadequate

performance if he shows that counsel omitted significant and obvious issues while

pursuing issues that were clearly and significantly weaker."[17]   However, "[t]he

failure to include a meritless argument does not fall outside the 'wide range of

professionally competent assistance'" to which a petitioner is entitled."[18]   Finally,

even if an attorney's performance were objectively unreasonable and

unprofessional, the petitioner must still prove prejudice.   That is, the petitioner

must show "'a reasonable probability' that, but for the deficiency, 'the result of the

---

[15]     *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting
*Strickland*, 466 U.S. at 690).

[16]     *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) (explaining that an
indigent appellant does not have a constitutional right to compel appointed
counsel to press every nonfrivolous point on appeal and recognizing "the
importance of having the appellate advocate examine the record with a view to
selecting the most promising issues for review"); *Mayo*, 13 F.3d at 533 ("[I]t is
not sufficient for the habeas petitioner to show merely that counsel omitted a
nonfrivolous argument, for counsel does not have a duty to advance every
nonfrivolous argument that could be made.").

[17]     *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000).

[18]     *Aparicio*, 269 F.3d at 99 (quoting *Strickland*, 466 U.S. at 690).

22

proceeding would have been different.'"[19] "A reasonable probability is one
sufficient to undermine confidence in the outcome of the trial or appeal."[20]

## C.     Procedural Default

It is well-settled that federal prisoners may not employ section 2255
as a substitute for direct appeal.[21]   As the Supreme Court explained in *United
States v. Frady*, "[o]nce the defendant's chance to appeal has been waived or
exhausted . . . we are entitled to presume he stands fairly and finally convicted,
especially when, as here, he already has had a fair opportunity to present his
federal claims to a federal forum."[22]  "Where a defendant has procedurally
defaulted a claim by failing to raise it on direct review, the claim may be raised on
habeas review only if the defendant can first demonstrate either 'cause' and actual
'prejudice,' or that he is 'actually innocent.'"[23]   The Supreme Court has made clear

---

[19]     *Id.* at 95 (quoting *Strickland*, 466 U.S. at 694).

[20]     *Id.  Accord Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) ("[T]he
'prejudice' component of the *Strickland* test . . . focuses on the question whether
counsel's deficient performance renders the result of the trial unreliable or the
proceeding fundamentally unfair.").

[21]     *See, e.g., United States* v. *Frady*, 456 U.S. 152, 165 (1982); *United
States* v. *Addonizio*, 442 U.S. 178, 184-85 (1979).

[22]     *Frady*, 456 U.S. at 164.

[23]     *Bousley* v. *United States*, 523 U.S. 614, 622 (1998) (citations
omitted).  *Accord Massaro* v. *United States*, 538 U.S. 500, 504 (2003) ("Claims

23

that "cause" is measured by a stringent standard of diligence.[24]   Furthermore, "the

resulting prejudice must create an '*actual* and substantial disadvantage, infecting

[the petitioner's] entire trial with error of constitutional dimensions.'"[25]

If a defendant fails to establish "cause" and "prejudice" to excuse a

procedural default, he can obtain collateral review of his constitutional claim only

by demonstrating that the constitutional error "has probably resulted in the

conviction of one who is actually innocent."[26]   The Supreme Court has emphasized

that "'actual innocence' means factual innocence, not mere legal insufficiency."[27]

---

not raised on direct appeal may not be raised on collateral review unless the
petitioner shows cause and prejudice."); *United States* v. *Warren*, 335 F.3d 76, 79
(2d Cir. 2003) ("If the defendant fails to raise a claim of error on direct appeal,
habeas relief is generally available only upon a showing of cause and prejudice.").

[24]     *See, e.g.*, *Coleman* v. *Thompson*, 501 U.S. 722, 753 (1991) ("cause"
is "something *external* to the petitioner" that "cannot be fairly attributed to him";
"[a]ttorney ignorance or inadvertence is not 'cause'") (emphasis in original);
*Murray* v. *Carrier*, 477 U.S. 478, 488 (1986) (("[C]ause for a procedural default
on appeal ordinarily requires a showing of some external impediment preventing
counsel from constructing or raising the claim.").

[25]     *Narvaez* v. *United States*, No. 95 CR 941, 2003 WL 21749638, at *2
(S.D.N.Y. July 29, 2003) (quoting *Frady*, 456 U.S. at 170) (emphasis in original).

[26]     *Bousley*, 523 U.S. at 623 (quotation and citation omitted).

[27]     *Id*. ("To establish actual innocence, petitioner must demonstrate that,
'in light of all the evidence,' 'it is more likely than not that no reasonable juror
would have convicted him.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28
(1995)).

24

## III.   DISCUSSION

### A.   Insufficiency Claims Are Not Cognizable on Habeas Review

Guastella argues throughout the Motion that there was insufficient evidence to support his convictions.  In short, Guastella seeks to distance himself from the fraudulent high-yield investment program, the existence of which the Government established by overwhelming evidence.  Guastella instead casts himself as an innocent operator of a legitimate Swedish "sparkassa" that was not connected, to his knowledge, to any high-yield investment scheme.  For example, Guastella maintains that he never solicited clients or placed any advertisements for high-yield investment programs; that he had no contact with any of the victims of the fraud; and that the evidence demonstrated that "at all times all rules and regulations were strictly adhered to pursuant to all Swedish Governmental directives."[28]

A challenge to the sufficiency of the evidence is not cognizable on collateral review.  Moreover, Guastella's insufficiency arguments mirror those he raised unsuccessfully in his pro se briefs on direct appeal.[29]  "It is well established

---

[28]   Motion at 28.

[29]   Guastella submitted a twenty-eight page list of points to be raised on appeal even though he was represented by counsel on appeal.

that a § 2255 petition cannot be used to 'relitigate questions which were raised and

considered on direct appeal.'"[30]  In *United States v. Sanin*, the Court of Appeals

made clear that re-litigation of issues addressed on direct appeal is permitted only

"where there has been an intervening change in the law and the new law would

have exonerated a defendant had it been in force before the conviction was

affirmed on direct appeal."[31]

      The Second Circuit readily disposed of Guastella's claim that there

was insufficient evidence to support his conviction.[32]   In its separate opinion

addressing the *Crawford* issue, the Second Circuit explained that

> [t]he evidence of Martins's and Guastella's guilt was
> overwhelming.  Documentary evidence established that
> Martins and Guastella agreed on the names of the fictitious
> European banks, and that Martins recruited potential
> investors while Guastella handled the logistics of

---

[30]    *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (quoting
*Cabrera v. United States*, 972 F.2d 23, 25 (2d Cir. 1992)). *Accord
Rosario-Dominguez v. United States*, 353 F. Supp. 2d 500, 508 (S.D.N.Y. 2005).

[31]    252 F.3d at 83 (quotation marks and citation omitted).

[32]    *See McClain*, 108 Fed. App'x at 676 ("Guastella contends that there
was insufficient evidence to support his convictions.  This argument is meritless in
light of the extensive evidence – much of it recovered from Guastella's residence
– that Guastella created the structures that he and Martins used as the fictitious
banks, set up accounts into which to place the proceeds of the scheme, and took
steps to prevent the victims from discovering the fraudulent nature of the
scheme.").

maintaining the illusion that the banks were real. After investors wired money to an account that Guastella maintained at Smith Barney, Guastella would transfer half of the funds to Martins and keep the rest. The two were in constant communication, and Guastella copied Martins on fraudulent letters that he sent to investors, pretending to be various bank officials. Moreover, defendants' knowledge of the fraudulent nature of their activities is demonstrated by, among other things, Martins's obtaining letterhead of a fictitious bank from a Las Vegas print shop, and Guastella's maintenance of a phony answering service in Sweden that forwarded to him messages meant for a fictitious bank. There was ample evidence that Martins and Guastella were guilty of the substantive offenses for which they were charged.[33]

Having been rejected by the Second Circuit, Guastella's claims regarding alleged insufficiency of evidence cannot be re-litigated in a motion brought under section 2255.[34]

## B.   Guastella's Trial Counsel Was Not Ineffective

Guastella argues that Stephen Stein, the attorney who represented him from the time of his arrest in September 1998 through the trial that ended in June 2001, was ineffective because he: (1) failed to inform Guastella of any plea offer;

---

[33]     *McClain*, 377 F.3d at 222-23.

[34]     *See Sanin*, 252 F.3d at 83; *Reiter v. United States*, 371 F. Supp. 2d 417, 429 (S.D.N.Y. 2005); *Krutikov v. United States*, 324 F. Supp. 2d 369, 370 (E.D.N.Y. 2004) ("[B]ecause petitioner's sufficiency of the evidence claim was litigated on appeal, it cannot now be re-litigated in a Section 2255 motion.").

(2) failed to prepare for trial and to obtain and introduce certain unspecified

documentary evidence; (3) maintained only limited contact with Guastella in the

months leading up to trial; (4) failed to take depositions of witnesses pursuant to

Rule 15 of the Federal Rules of Criminal Procedure; failed to call other witnesses

who would have presented material and favorable testimony for the defense; (5)

delivered an ineffective summation; (6) failed to raise a conflict of interest that

affected Martins' counsel; (7) failed to challenge a potentially biased juror; (8)

forced Guastella to testify, and to do so in narrative form; (9) tricked Guastella

into signing a stipulated judgment of forfeiture; and (10) failed to file post-trial

motions.

### 1.    **Guastella Cannot Establish Prejudice**

Guastella's ineffective assistance claims can be disposed of

summarily because Guastella is unable to establish prejudice given the strength of

the Government's case. As the Supreme Court explained in *Strickland*, "a court

need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the defendant as a result of the alleged

deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the

ground of lack of sufficient prejudice, which we expect will often be so, that

course should be followed."[35]

The case against Guastella was overwhelming. The evidence at trial,

summarized above, showed beyond a reasonable doubt that Guastella knowingly

and intentionally held out First Mutual Sparkassa and Euro Banque as real

European banks that were "leasing" funds for use in high-yield investment

programs. In fact, First Mutual Sparkassa and Euro Banque were not real banks

and did not have the money they claimed to be holding in "custodial trust

accounts" for investors. As a result of Guastella's deliberate misrepresentations,

investors paid millions of dollars for "proof of funds" letters that were simply

worthless sheets of paper. Given the overwhelming evidence of Guastella's guilt,

there is no "reasonable probability" that anything he claims his trial counsel failed

to do or should have done differently would have altered the outcome of the trial.[36]

---

[35]     *Strickland*, 466 U.S. at 697. *Accord Strouse v. Leonardo*, 928 F.2d
548, 556 (2d Cir. 1991) (declining to address counsel's alleged deficiencies given
the overwhelming evidence of guilt at trial); ); *United States v. Reiter*, 897 F.2d
639, 645 (2d Cir. 1990) (despite "concededly questionable and unprofessional
conduct" on the part of counsel, no prejudice was found because evidence of guilt
was overwhelming); *Mathurin v. United States*, No. 01 Civ. 1374, 2007 WL
2589450, at *11 (S.D.N.Y. Sept. 5, 2007) (observing that "the ineffective
assistance decisions by the Court of Appeals commonly emphasize the strength of
the Government's case against the defendant").

[36]     *See Strickland* 466 U.S. at 694 (petitioner "must show that there is a
reasonable probability that but for counsel's unprofessional errors, the result of the
proceeding would have been different"). *See also United States v. Simmons*, 923

29

Because Guastella cannot show any prejudice resulting from the failures and mistakes allegedly made by his attorney, his ineffective assistance of counsel claims are dismissed.[37]

## C.    The Government Did Not Engage In Prosecutorial Misconduct

Guastella asserts that the Government engaged in prosecutorial misconduct because its prosecutors: (1) permitted certain witnesses to commit perjury; (2) withheld exculpatory evidence from the jury in violation of *Brady v. Maryland*;[38] (3) made misleading and improper statements during closing arguments and at other points in the proceedings; and (4) engaged in both selective and vindictive prosecution. Guastella unsuccessfully raised each of these

---

F.2d 934, 956 (2d Cir. 1991) ("[G]iven the plethora of evidence against [the defendant], there is little reason to believe that alternative counsel would have fared any better."); *Reiter*, 897 F.2d at 645 (even though counsel's performance fell below professionally reasonable standards, defendant's ineffective assistance claim failed "given the overwhelming evidence of [the defendant's] guilt"); *Dehaney v. United States*, No. 97 CR 54, 2001 WL 1242289, at *4 (S.D.N.Y. Oct. 16, 2001) ("[E]ven if the court deemed [counsel's] performance deficient, which it does not, the court would deny the petitioner's ineffective assistance claim based on the overwhelming nature of the Government's case.").

[37]    Even if Guastella could somehow show prejudice, which he cannot, the Government has convincingly argued that Guastella's laundry list of Stein's alleged errors, even if taken together, do not amount to a deprivation of reasonably competent representation. *See* 6/2/08 Letter-Brief from AUSA Lee Renzin at 25-39. Thus, Guastella has failed to satisfy both prongs of the *Strickland* standard.

[38]    373 U.S. 83 (1963).

grounds of prosecutorial misconduct on direct appeal, and there have been no

applicable changes in the law. Accordingly, Guastella cannot re-litigate these

claims on habeas review.[39]  Moreover, none of the  prosecutorial misconduct

claims have any merit and must therefore be dismissed.[40]

### 1.    Alleged Perjury by Government Witnesses

Guastella argues that the Government "allowed perjured testimony by

a number of witnesses[.]"[41]  This argument, which was squarely rejected by the

Second Circuit,[42] is without merit. "Reversal of a conviction based upon

allegations of perjured testimony should be granted only with great caution and in

the most extraordinary circumstances." [43]   To prevail on such a claim, a petitioner

must show: "(i) the witness actually committed perjury; (ii) the alleged perjury

_____

[39]     *See Sanin*, 252 F.3d at 83.

[40]     *See Mendez v. United States*, 379 F. Supp. 2d 589, 598 (S.D.N.Y.
2005) ("To merit habeas relief on a claim of prosecutorial misconduct, petitioner
must show that the alleged misconduct denied him a fair trial.") (citing *Greer v.
Miller*, 483 U.S. 756, 765 (1987)).

[41]     Motion at 9.

[42]     *See McClain*, 108 Fed. App'x at 675 ("[Guastella] asserts that the
government suborned perjury but does not establish that any witness actually
committed perjury or that the government knew or should have known about the
alleged perjury.").

[43]     *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000)
(quotation marks and citation omitted).

31

was material; (iii) the government knew or should have known of the alleged

perjury at [the] time of trial, and (iv) the perjured testimony remained undisclosed

during trial."[44]     According to Guastella, the witnesses who committed perjury

were Klein, the in-house Smith Barney attorney, Marietta Chatzigeorgiou, a Swiss

psychotherapist and a victim of the scheme, and Herbert A. Biern, who worked for

the Federal Reserve Board and testified regarding his experience with high-yield

investment frauds.[45]  Guastella also claims that the Government's rebuttal witness,

Lawrence Whelan, Jr., a Caesar's Palace employee, provided "false testimony."[46]

Guastella does not, however, provide a single citation to the testimony of any of

these witnesses that he claims constitutes perjury, let alone an explanation of how

their testimony was material.  Nor does he provide any basis in which to conclude

that the Government knew or should have known of such perjury.  Accordingly,

Guastella's prosecutorial misconduct claim based on alleged perjury by

Government witnesses must be dismissed.

---

[44]     *Id.* (quotation marks and citations omitted).

[45]     *See* Motion at 9.

[46]     *Id.*

## 2.    The Government Did Not Violate *Brady*

Guastella argues that the Government violated *Brady* by withholding

exculpatory evidence from the jury, including an "extensive amount of contracts"

from participating traders which do not mention Guastella.[47]    On direct appeal,

the Second Circuit rejected Guastella's *Brady* claim because he did "not claim that

the government withheld any material from the defense."[48]    Having failed to

assert any intervening change in the law, Guastella cannot re-litigate his *Brady*

claim in the context of a section 2255 motion.[49]

## 3.    Alleged Prosecutorial Misstatements

On collateral review, "[t]he relevant question is whether the

prosecutors' comments so infected the trial with unfairness as to make the

resulting conviction a denial of due process."[50]   Accordingly, a conviction will be

reversed only upon a showing "'(1) that the prosecutor's statements were improper

and (2) that the remarks, taken in the context of the entire trial, resulted in

---

[47]      Motion at 24.

[48]      *McClain*, 108 Fed. App'x at 675.

[49]      *See Sanin*, 252 F.3d at 83.

[50]      *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks
and citation omitted).

substantial prejudice.'"[51]

Guastella argues that the prosecutor used his closing argument to "inflame and purposely mislead the jury and inflame passions and prejudices of a jury," and to "argue facts that were not even in evidence."[52] Guastella does not, however, provide specific examples of the Government's alleged improprieties during its closing argument, let alone improprieties that caused Guastella substantial prejudice. The Government is entitled to "broad latitude in the inferences [it] may suggest to the jury during closing arguments," provided it does not misstate the evidence.[53] "A prosecuting attorney is not an automaton whose role on summation is limited to parroting facts already before the jury. He is an advocate who is expected to prosecute diligently and vigorously, albeit without appeal to prejudice or passion."[54] Moreover, a prosecutor's summation need not

---

[51] *United States v. Thomas*, 377 F.3d 232, 244 (2d Cir. 2004) (quoting *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998)) ("To require reversal of a conviction, a prosecutor's comments upon summation must so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.") (alteration in original, quotation marks and citations omitted).

[52] Motion at 12.

[53] *United States v. Myerson*, 18 F.3d 153, 163 (2d Cir. 1994) (quotation marks and citation omitted).

[54] *United States v. Wilner*, 523 F.2d 68, 74 (2d Cir. 1975).

consist of "such detached exposition as would be appropriate in a lecture . . . ."[55] Rather, a prosecutor is "entitled to respond to the evidence, issues, and hypotheses propounded by the defense[.]"[56] A review of the Government's summation in light of these principles confirms that there was no prosecutorial misconduct with regard to the Government's closing argument.

Aside from the closing argument, Guastella points to two other instances of alleged prosecutorial misconduct during the trial – both of which took place outside the presence of the jury. The first arose in determining whether a witness could testify to a statement made by Peggy Anderson, an alleged co-conspirator. The Government argued that Anderson was a co-conspirator based on the fact that she received money from Guastella's Global Credit account at Smith Barney. Guastella disputes the prosecutor's statement that this account was "controlled by both defendants." Given the clear evidence that Guastella controlled the account, the only possible misstatement by the prosecutor was that Martins had some control over the account. To the extent this was incorrect, it would not have changed the significance of the payment to Anderson in

---

55      *United States v. Wexler*, 79 F.2d 526, 530 (2d Cir. 1935). *Accord United States v. Mercado*, 296 Fed. App'x 115, 118 (2d Cir. 2008) (citing *Wexler*).

56      *United States v. Marrale*, 695 F.2d 658, 667 (2d Cir. 1982).

determining whether she was a co-conspirator. It certainly does not rise to the level of unconstitutional prejudice. Guastella's second example of misconduct consists of a statement made by the prosecutor which implied that a statement made by someone identifying himself as Michael McClain was, in fact, made by Guastella. Given the overwhelming evidence that Guastella identified himself as McClain throughout the course of the fraudulent scheme, there was nothing improper about this statement.

Guastella also claims that at his sentence, the Government misleadingly informed this Court that Guastella cut off his electronic monitoring bracelet before he appeared in court for the verdict when, in fact, Guastella removed the bracelet prior to traveling to New York for trial. At sentencing, Guastella's attorney stated that Guastella was not on electronic monitoring during the trial and asked the Court not to consider the Government's statement regarding the bracelet. Because this Court was not aware of the cut bracelet issue, it did not impact its sentencing analysis. Accordingly, Guastella cannot claim that he was prejudiced by the Government's misstatement. In sum, because none of the prosecutor's alleged misstatements resulted in prejudice to Guastella, they cannot support a claim of prosecutorial misconduct.

### 4.    The Government Did Not Engage in Selective or Vindictive Prosecution

Guastella's selective prosecution/equal protection claim rests on the Government's decision not to charge every single person involved in Guastella's fraudulent scheme.[57]  It is well-settled, however, that "the decision as to whether to prosecute generally rests within the broad discretion of the prosecutor."[58]  "To make out a claim of selective prosecution, a defendant confronts a deliberately 'rigorous standard'" and "must provide 'clear evidence' that the prosecutorial decision or policy in question had both 'a discriminatory effect and . . . was motivated by a discriminatory purpose.'  The discriminatory effect prong requires a showing that 'similarly situated individuals of a different [classification] were not prosecuted.'"[59]  To show discriminatory purpose, Guastella must show that the prosecutor "selected or reaffirmed a particular course of action at least in part

---

[57]    *See* Motion at 23 ("The Equal protection clause of the Fifth Amendment Due Process clause precludes selective enforcement of the law based upon unjustifiable factors.  The government chose six co-defendants when they were aware of at least twenty (20) or more people who were doing this business for many years and have received literally cumulatively, millions of dollars.").

[58]    *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (quotation marks and citation omitted).

[59]    *Id.* (quoting *United States v. Armstrong*, 517 U.S. 456, 465, 468 (1996) (alteration in original)).

because of, not merely in spite of, its adverse effects upon an identifiable group."[60]

Guastella's conclusory allegation that the Government did not charge every

potential member of the conspiracy – without alleging that the Government's

actions were motivated by a discriminatory purpose – is not sufficient to satisfy

this "rigorous standard." The failure to allege a discriminatory purpose dooms

Guastella's selective prosecution/equal protection claim. Furthermore, a

defendant must raise a selective prosecution claim before trial, which Guastella

did not do.[61]

---

[60]     *Eagleston v. Guido*, 41 F.3d 865, 878 (2d Cir. 1994) (quotation marks and citation omitted). *Accord United States v. Chalmers*, 474 F. Supp. 2d 555, 568 (S.D.N.Y. 2007) ("To state a claim for selective prosecution, a defendant must make a prima facie showing both: (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [the defendant], he has been singled out for prosecution, and (2) that the government's discriminatory selection of [the defendant] for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.") (alterations in original).

[61]     *See United States v. Stewart*, No. 03 CR 717, 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) ("'In this Circuit, a defendant who advances a claim of selective prosecution must do so in pretrial proceedings.'" (quoting *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983)); *Foy v. United States*, 838 F. Supp. 38, 41 n.3 (E.D.N.Y. 1993) ("[A] defendant waives his defense of selective prosecution unless he properly raises it before trial.") (citing *United States v. Taylor*, 562 F.2d 1345, 1356 (2d Cir. 1977)).

Guastella also makes a vindictive prosecution argument, alleging that the Government "sought additional charges solely to punish Guastella for exercising his constitutional or statutory rights."[62]   To succeed on a claim of prosecutorial vindictiveness, Guastella must establish either "actual vindictiveness" or "a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action."[63]   Actual vindictiveness requires a showing that "(1) the prosecutor harbored genuine animus toward the defendant . . . and (2) the defendant would not have been prosecuted but for the animus."[64]   Alternatively, to establish a presumption of prosecutorial vindictiveness, Guastella must show that "the circumstances of a case pose a realistic likelihood of such vindictiveness."[65]   Moreover, "any such presumption may be 'overcome by objective evidence justifying the prosecutor's action.'"[66]

---

[62]      Motion at 17.  Guastella frames his prosecutorial vindictiveness claim as a denial of due process.  *See id.* at 26.

[63]      *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999).

[64]      *Chalmers*, 474 F. Supp. 2d at 568 (citing *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000)).

[65]      *Sanders*, 211 F.3d at 717 (quotation marks and citations omitted).

[66]      *Id.* (quoting *United States v. Goodwin*, 457 U.S. 368, 376 n.8 (1982)).

In light of the applicable law, Guastella's vindictive prosecution claim must be dismissed. Although the Government filed a Superseding Indictment which contained additional counts, Guastella does not identify what "constitutional or statutory rights" he exercised that purportedly caused the Government to levy additional charges against him. Nor has Guastella proffered any evidence "of genuine animus on the part of the prosecutors assigned" to his case.[67] Guastella has satisfied neither standard for a vindictive prosecution claim.[68]

In sum, none of the grounds raised by Guastella support a claim for prosecutorial misconduct. Accordingly, Guastella's prosecutorial misconduct claim is dismissed.

---

[67]   *Chalmers*, 474 F. Supp. 2d at 569.

[68]   *See Mejia v. United States*, Nos. 06 Civ. 12943, 05 CR 363, 2007 WL 2388907, at *4 (S.D.N.Y. Aug. 21, 2007) ("There is no suggestion here that the Government did not have probable cause to believe that Mejia committed each of the crimes with which he was charged. There is also nothing exceptional about the Government adding more charges, including more serious charges, against a defendant when it appears that the case may proceed to trial and the Government's continued investigation supports those charges. In addition, there is no showing – beyond conclusory allegations – demonstrating either actual or presumptive vindictiveness relating to the charging decision.").

## D.      This Court Had Subject Matter Jurisdiction

Guastella maintains this Court lacked subject matter jurisdiction over

his prosecution because "[n]o illegal . . . activity in the instant case was ever

consummated or executed in the Southern District of New York."[69]  Although

Guastella casts his arguments in terms of subject matter jurisdiction, his claim is

more properly construed as a challenge to venue.  Having failed to raise a

challenge to venue at trial or on appeal – and having failed to establish cause for

such failure – Guastella's " jurisdiction claim" is procedurally defaulted.[70]  In any

event, there is no question that venue did exist in the Southern District of New

York.  The evidence at trial established that funds illegally obtained as a result of

the fraudulent scheme were wired into and out of banks located in the Southern

District of New York.  This is sufficient for establishing venue.[71]

---

[69]      Motion at 13.

[70]      *See Sapia*, 433 F.3d at 217; *Canady*, 126 F.3d at 359; *United States v. Calderon*, 243 F.3d 587, 590 (2d Cir. 2001) (venue is not jurisdictional and is subject to waiver in a criminal case); *United States v. Cestero*, 767 F. Supp. 500, 501 (S.D.N.Y. 1991) ("It is axiomatic that questions of venue can be waived."); *Williams v. United States*, 582 F.2d 1039, 1042 (6th Cir. 1978) (improper venue claim not cognizable under section 2255) (citing cases).

[71]      *See United States v. Kim*, 246 F.3d 186, 191-92 (2d Cir. 2001); *United States v. Gilboe*, 684 F.2d 235, 239 (2d Cir. 1982); *United States v. Brown*, No. 05 CR 857, 2006 WL 2930204, at *2 (S.D.N.Y. Oct. 11, 2006) ("[W]hen proceeds of fraud are transferred through New York in interstate or foreign

41

Guastella couples his "jurisdictional" argument with a claim that the

Indictment failed to allege a sufficient nexus to interstate commerce.[72] Guastella's

argument fails for two reasons. *First*, Guastella did not raise an interstate

commerce nexus claim on appeal and does not make a showing of cause for this

omission; thus, the claim is procedurally defaulted.[73] *Second*, the Indictment

plainly alleged the requisite nexus to interstate or foreign commerce with respect

to each of the charged counts. Accordingly, Guastella's claim that this Court

lacked subject matter jurisdiction is without merit and must be dismissed.

### E.     Any *Crawford* Error Was Harmless

At trial, the Government introduced redacted portions of the plea

allocutions of three of Guastella's co-defendants, solely for the purpose of proving

the existence of the conspiracy. The allocutions were not introduced to prove that

Guastella and Martins were members of that conspiracy. This Court instructed the

jury, both at the time of admission and in the jury charge, to consider the

---

commerce venue in New York is proper under 18 U.S.C. § 3237(a).").

[72]     *See* Motion at 14-15.

[73]     *See Sapia*, 433 F.3d at 217; *Canady*, 126 F.3d 352, 359-60; *Macias v. United States*, No. 06 Civ. 14206, 2006 WL 3746724, at *2 (S.D.N.Y. Dec. 20, 2006) (absent a showing of cause and prejudice, petitioner waived arguments pertaining to interstate commerce nexus by failing to raise them on direct appeal).

allocutions only as evidence that the conspiracy existed.  Nonetheless, admission

of these plea allocutions violated the Supreme Court's decision in *Crawford* which

held that "no prior testimonial statement made by a declarant who does not testify

at the trial may be admitted against a defendant unless the declarant is unavailable

to testify and the defendant had a prior opportunity to cross-examine him or her."[74]

On direct appeal, the Second Circuit held that although the

admissions of the allocutions violated the defendants' Confrontation Clause rights,

the error was harmless because the "evidence of Martins's and Guastella's guilt

was overwhelming."[75]  The Second Circuit also noted that the jury was given a

limiting instruction, which it presumably followed.[76]  The Second Circuit

concluded that

> [w]ith respect to the existence of the conspiracy, the plea
> allocutions were cumulative, as the documentary evidence
> established that Martins and Guastella set up the fictitious
> banks together and worked in tandem throughout the
> duration of the scheme.  The admission of the plea
> allocutions was therefore harmless beyond a reasonable
> doubt.[77]

---

[74]   *McClain*, 377 F.3d at 221 (citing *Crawford*, 541 U.S. at 59).

[75]   *Id.* at 222.

[76]   *See id.* at 223.

[77]   *Id. Accord Kamara v. United States*, No. 04 Civ. 5340, 2005 WL
1337396, at *3 (S.D.N.Y. June 6, 2005) (to the extent *Crawford* applies

Having litigated this issue unsuccessfully on direct appeal, Guastella may not

re-litigate it on habeas review.

### F.    Any Alleged Sentencing Errors Do Not Warrant Relief

Sentencing errors are generally not cognizable on collateral review.[78]

Nonetheless, Guastella asserts several claims regarding the impropriety of his

sentence, none of which have any merit.  First, Guastella challenges this Court's

finding that he committed perjury, which resulted in an obstruction of justice

enhancement.[79]   The Second Circuit rejected this argument on direct appeal:

> The crux of Guastella's argument is that his testimony that
> he did not defraud anyone was not perjurious because he
> honestly believed that his actions were lawful.  The district
> court correctly applied the enhancement, however, because

---

retroactively, error was harmless where there was "more than 'ample evidence' of
Petitioner's guilt presented to the jury" and where "the jury was instructed that it
could consider the plea allocution for the limited purpose of establishing that a
conspiracy existed, not Petitioner's participation in the conspiracy"); *Muyet v.
United States*, No. 03 Civ. 4247, 2004 WL 2997866, at *10 (S.D.N.Y. Dec. 27,
2004) (same).

[78]    *See, e.g., Kleinberg v. United States*, Nos. 00 Civ. 3621, 97 CR 114,
97 CR 1001, 2000 WL 686213, at *2 (S.D.N.Y. May 25, 2000) ("Non-
constitutional errors of law, including sentencing errors, do not provide a basis for
collateral attack unless the claimed error constitutes a fundamental miscarriage of
justice.  Under this stringent standard the Second Circuit has ruled that sentencing
errors generally are not cognizable on habeas corpus.") (quotation marks and
citations omitted).

[79]    *See* Motion at 26.

> the jury rejected any assertion that Guastella did not
> believe that his actions were fraudulent when it convicted
> him of wire fraud. Where, as here, the defendant's
> testimony relates to an essential element of his offense . .
> . the judgment of conviction necessarily constitutes a
> finding that the contested testimony was false. Given the
> many instances in which Guastella's testimony differed
> from the evidence, the district court's finding that
> Guastella intentionally perjured himself in order to obstruct
> justice is not clearly erroneous.[80]

The Second Circuit's denial of this claim prevents Guastella from raising it again

in a section 2255 motion.

Second, Guastella takes issue with the Government's representation

of his criminal history. Guastella argues that there was insufficient evidence of his

prior encounters with the law, notwithstanding their inclusion in the Presentence

Report.[81]  In a December 4, 2001 letter objecting to the Presentence Report,

Guastella's attorney objected "to the inclusion of information regarding dated

arrests resulting in dismissals." As explained at sentencing, Guastella's previous

encounters with the law was just one of the factors that I took into account in not

imposing a sentence at the lowest end of the applicable Guidelines range of

188-235 months.

---

[80]     *McClain*, 108 Fed. App'x at 675 (quotation marks and citation
omitted, alteration in original).

[81]     *See* Motion at 18.

> I made this decision not to go to the low end of the guideline range because of his many prior encounters with the law all in the nature of fraudulent conduct, his continued fraudulent conduct as evidenced by his most recent arrest, his perjury at trial, his post-trial flight, and the enormous damage his criminal activities have caused to well over 150 victims, many of whom have written to this Court. His criminal conduct caused many of these victims to lose their entire life savings. For all of these reasons, Mr. Guastella's punishment requires a very significant period of incarceration and I'm considering 200 months.[82]

In light of the above, any error claimed by Guastella regarding his criminal history does not constitute the type of fundamental miscarriage of justice that warrants habeas relief.

Third, Guastella claims a "seriously unwarranted disparity of sentence compared to the uniformly below guidelines sentences imposed on four (4) even more culpable co-defendants."[83] This argument, which was not raised at sentencing, merits little consideration given the fact that the co-defendants referred to by Guastella entered guilty pleas instead of going to trial. Because they pled guilty, these co-defendants were not similarly situated to Guastella. Accordingly, any disparities in sentencing between Guastella and these co-

---

[82]   Sentencing Transcript at 49.

[83]   Motion at 31-32.

defendants was not unwarranted.[84]

## G.   The Discovery Motion Is Denied

On January 28, 2008, Guastella filed the Discovery Motion which

seeks the following categories of evidence: *Brady* Material; Negative Evidence;

Evidence of Lack of Criminal Intent or Knowledge; Impeaching Evidence;

Exonerative Evidence; Grand Jury; Electronic Surveillance, Mail Cover, Scientific

Experiments, Tests, Markings, and Tracings; Attorney-Client Relationship; and

Publicity. Under the Rules Governing Section 2255 Proceedings, a party seeking

discovery "must provide reasons for the request."[85]  A court may authorize a party

to conduct discovery "for good cause."[86]  "Whether a petitioner has shown 'good

cause' depends on whether the petitioner has set forth specific allegations that

provide 'reason to believe that the petitioner may, if the facts are fully developed,

---

[84]     *Cf. United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009)
("Carter himself recognized that one reason for the disparity between his sentence
and that of two of his co-conspirators was due to their decision to cooperate with
the government. However, a sentencing disparity based on cooperation is not
unreasonable.").

[85]     Rule 6(b) of the Rules Governing Section 2255 Proceedings For The
United States District Courts.

[86]     *Id.* Rule 6(a).

be able to demonstrate that he is . . . entitled to relief.'"[87]  Guastella does not even

come close to satisfying the "heavy burden in establishing a right to discovery."[88]

Guastella's seven-page Discovery Motion consists almost exclusively

of boilerplate pre-trial discovery motion language, with the exception of a few

minor modifications that allude to Guastella's defense at trial that he lacked

criminal intent and did not engage in any fraudulent conduct.  The few requests

that are not boilerplate are vague, overbroad, and in no way suggest the existence

of any evidence that has not already been produced or which could somehow

advance Guastella's section 2255 claims.[89]  In sum, Guastella's Discovery Motion

---

[87]     *Gonzalez v. Bennett*, No. 00 Civ. 8401, 2001 WL 1537553, at *4
(S.D.N.Y. Nov. 30, 2001) (quoting *Bracy v. Gramley*, 520 U.S. 899, 909 (1997)).

[88]     *Renis v. Thomas*, No. 02 Civ. 9256, 2003 WL 22358799, at *2
(S.D.N.Y. Oct. 16, 2003).

[89]     *See Armatullo v. Taylor*, No. 04 Civ. 5357, 2005 WL 2386093, at *21
(S.D.N.Y. Sept. 28, 2005) (denying discovery request where "the record presently
before the Court shows no merit to any of Armatullo's claims.  Armatullo's
personal belief that further discovery will yield evidence helpful to him is not
enough to establish 'good cause' for granting his requests."); *Gonzalez*, 2001 WL
1537553, at *4 ("Generalized statements about the possible existence of discovery
material are insufficient to constitute 'good cause.'  Likewise, a court has
discretion to deny a motion for discovery where the petitioner provided no specific
evidence that the requested material would support his habeas corpus petition.");
*Green v. Artuz*, 990 F. Supp. 267, 271 (S.D.N.Y. 1998); *Charles v. Artuz*, 21 F.
Supp. 2d 168, 169 (E.D.N.Y. 1998) (rejecting discovery motion where petitioner's
"stated purpose is merely to determine whether the requested items contain any
grounds that might support his petition, and not because the documents actually

is a "mere fishing expedition" of the sort routinely denied by district courts.[90]

Because Guastella has not provided sufficient reasons for the requested discovery,

thereby leaving this Court without good cause to authorize discovery in these

proceedings, his Discovery Motion is denied.

## IV.   CONCLUSION

For the foregoing reasons, Guastella's section 2255 motion is denied.

Finally, the Court must decide whether to grant a certificate of appealability.[91]  A

certificate of appealability will issue when the petitioner makes a "substantial

showing of the denial of a constitutional right."[92]  A "substantial showing" does

not require a petitioner to demonstrate that he would prevail on the merits, but

merely that reasonable jurists could debate whether "the petition should have been

resolved in a different manner or that the issues presented were 'adequate to

---

advance his claims of error").

[90]     *See, e.g., Renis*, 2003 WL 22358799, at *2 (denying discovery motion
where "requests are vague and overbroad, and [petitioner] has asserted no
particularized reasons justifying their wide scope"); *Perez v. United States*, 274 F.
Supp. 2d 330, 336 (E.D.N.Y. 2003) ("Where, as here, the request for discovery is a
mere fishing expedition, the Court will not grant it."); *Munoz v. Keane*, 777 F.
Supp. 282, 287 (S.D.N.Y. 1991) ("[P]etitioners are not entitled to go on a fishing
expedition through the government's files in the hopes of finding some damaging
evidence.").

[91]     *See* 28 U.S.C. § 2253(c)(1)(B).

[92]     *Id.* § 2253(c)(2).

deserve encouragement to proceed further.'"[93]  Petitioner has made no such

showing.  Accordingly, I decline to grant a certificate of appealability.  The Clerk

of the Court is directed to close the civil case and the section 2255 motion

(Document # 1 in 06 Civ. 2924) and the Motion for Inspection and Discovery in

the criminal case (Document # 224 in 98 CR 1325).


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              May 8, 2009

---

[93]        *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v.
Estelle*, 463 U.S. 880, 893 n.4 (1983)). *Accord Middleton v. Attorneys Gen. of the
States of New York and Pennsylvania*, 396 F.3d 207, 209 (2d Cir. 2005) (denying
certificate of appealability where reasonable jurists could not debate whether the
district court's dismissal of the petition was correct).

## - Appearances -

**Petitioner (Pro Se):**

Antonio Guastella
# 14537-116
FCI - Lompoc
3600 Guard Road
Lompoc, CA 93436

**For Respondent:**

Lee Renzin
Assistant United States Attorney
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2723